HINCHMAN et al. v. RIPINSKY.

RIPINSKY v. HINCHMAN et al.

(Circuit Court of Appeals, Ninth Circuit.   January 13, 1913.)

Nos. 1,993, 2,015, and 2,045.

1. APPEAL AND ERROR (§ 1208*)—REVERSAL—RESTITUTION OF COSTS COL-LECTED IN LOWER COURT.

The awarding of costs to an appellant on reversal of the decree be-low by a Circuit Court of Appeals is a part of the judgment of that court, which cannot be changed by any action of the court below after the cause is remanded; and where the decree for costs entered in the trial court against the appellant was collected pending the appeal, it is proper for that court, on receipt of the mandate, to award restitution of such costs.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4701–4709;  Dec. Dig. § 1208.*]

2. COSTS (§ 32*)—PUBLIC LANDS—SUIT IN SUPPORT OF ADVERSE CLAIM.

In a suit against a homestead settler in Alaska in aid of an adverse claim, brought under Act May 14, 1898, c. 299, § 1, 30 Stat. 409 et seq. (U. S. Comp. St. 1901, p. 1412), extending the homestead laws to that territory, as amended by Act March 3, 1903, c. 1002, 32 Stat. 1028 (U. S. Comp. St. Supp. 1911, p. 606), to prevent the issuance of a patent to the homestead claimant, where neither party establishes a right to the land, neither should be allowed costs.

[Ed. Note.—For other cases, see Costs, Cent. Dig. §§ 108–132;  Dec. Dig. § 32.*]

3. PUBLIC LANDS (§ 39*)—TOWN SITES—SUIT IN AID OF ADVERSE CLAIM—JOINDER OF CLAIMANTS.

Occupants of lots on public land in an unincorporated town in Alaska, who have made application to have the same surveyed as a townsite, pending the appointment of a town-site trustee, may join in a suit brought in aid of a contest filed against the issuance of a patent on a homestead entry which conflicts with their claims.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 83–90, 92–99;  Dec. Dig. § 39.*]

4. PUBLIC LANDS (§ 39*)—CONTEST BETWEEN TOWN SITE AND HOMESTEAD CLAIMANTS—EVIDENCE OF POSSESSION CONSIDERED.

Evidence considered, in a suit by settlers on public land who had made application for its survey as a town site, in aid of an adverse claim filed against defendant's application for a patent on a homestead entry, and *held* not to show such prior and continued possession by defendant as to entitle him to a patent, except as to a portion of the tract claimed which had been actually occupied and improved by him and his predecessors in interest.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 83–90, 92–99;  Dec. Dig. § 39.*

Rights acquired by homestead settlements and entries, see note to McCune v. Essig, 59 C. C. A. 434.]

Appeal from the District Court of the United States for Division No. 1 of the District of Alaska;  Edward E. Cushman, Judge.

Suit in equity by G. W. Hinchman and others against Solomon Rip-insky.   From the decree both parties appeal.   Reversed in part.

Lewis P. Shackleford, of Juneau, Alaska, and Alfred Sutro, of San Francisco, Cal. (Albert Fink, of San Francisco, Cal., of counsel), for plaintiffs.

R. W. Jennings, of Baltimore, Md., and J. H. Cobb, of Juneau, Alaska, for defendant.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. This is the second appeal. The cause was reversed on the first, and remanded for such further proceedings as to the trial court might seem proper. The District Court allowed an amendment of the complaint in such manner as to show that the suit was instituted in support of an adverse claim, entered in the Land Office, to the application of the defendant, Solomon Ripinsky, for a homestead patent in pursuance of survey No. 573. A new trial was had, resulting in a decree that plaintiffs take nothing by the bill of complaint; that defendant is the owner of the following parcels of land, comprised by survey No. 573, namely, a parcel 100x150 feet in area in the extreme east end of said survey, and parcel No. 5, in block 1, according to a plat made by Walter Fogelstrom; and that Ripinsky, the defendant, recover of and from the plaintiffs his costs and disbursements. From this decree, both plaintiffs and defendant prosecute an appeal. The appeal of Ripinsky is known on the docket here as No. 2,015, and that of Hinchman et al. as No. 2,045. When the cause was reversed on the prior appeal, costs were awarded to Ripinsky, the defendant and appellant. The amount of these costs was taxed at $1,436.95. While the cause was on appeal, the plaintiffs, who were appellees here, issued execution and enforced payment by Ripinsky of the costs and disbursements awarded against him in the trial court, amounting to $456.75. When the mandate of this court went down, counsel for Ripinsky moved the District Court that, in entering its decree upon the mandate, it include therein a decree also against the plaintiffs for restitution of the costs collected under execution upon the reversed decree, which motion was allowed, and decree entered accordingly. The plaintiffs have filed an appeal from this decree also. Its docket number here is 1,993. All these appeals have been consolidated, and were heard together. It will be convenient to dispose of the last-named appeal first, and then the other two will be disposed of as one cause.

[1] The costs on appeal were awarded by this court. Such award constituted part and parcel of its judgment in reversing the cause brought up. It became a finality, and when the cause went down the court below was bound to observe the injunctions of the mandate. The judgment was binding on the court below, and it had no power or authority to revise or modify it, or to do otherwise than to enter it as the judgment of that court. From such judgment, there was no second appeal to this court. It is almost axiomatic that none of the questions before the court and determined on writ of error or appeal can be heard or re-examined if the case be again brought up. To allow this would lead to endless litigation, and the end of the law could

never be reached. 2 Ency. U. S. Sup. Ct. Reports, p. 412, and notes, pp. 412, 413, 414. In this case the costs on the appeal were a matter determined by this court, and a second appeal as to these falls clearly within the principle stated, and is not allowable.

While it is true that appellant in the first appeal, by his objection to the first amended complaint, as appears now from the record brought here in case No. 2,045, was instrumental in causing the pleadings to be so amended as to present a simple cause for quieting title, and not one in aid of an adverse claim, yet it was within the privilege of the appellees to bring up that record by an amendment to the abstract, and in that way the entire cause could then have been fully presented. It is incumbent on the appellant to bring up so much of the record only, not omitting the evidence, of course, as will present the matters he relies upon for error. If the appellee conceives there is error against him in the record, or such action had as will cure the errors relied upon by appellant, he should bring it to the attention of the court by an amendment of the abstract. Not observing this principle, he alone is to blame, and not the appellant.

As it respects the restitution awarded by the District Court, that was a relief very properly granted, under the condition of the record at that time. The decree of the trial court stood reversed and annulled, and the appellant was entitled to have that returned to him which was taken away by an erroneous judgment. Northwestern Fuel Co. v. Brock, 139 U. S. 216, 220, 11 Sup. Ct. 523, 35 L. Ed. 151, is decisive of the question. Cause No. 1,993 should therefore be affirmed, with costs against the appellants.

The statute under which this proceeding is now pending is that of May 14, 1898 (30 Stat. 409, 413, 414, c. 299 [U. S. Comp. St. 1901, p. 1412]), extending the homestead laws of the United States to the territory of Alaska, as amended by the act of March 3, 1903 (32 Stat. 1028, 1029, c. 1002 [U. S. Comp. St. Supp. 1911, p. 606]). By that statute, when application for patent is made under the homestead law, and notice given, any person having an adverse interest in or claim to the land for which patent is sought may, within a time fixed by the act, file an adverse claim setting forth the nature and extent thereof, and within 30 days thereafter may begin an action to quiet title in a court of competent jurisdiction in the district of Alaska, after which it is declared:

"No patent shall issue for such claim until the final adjudication of the rights of the parties, and such patent shall then be issued in conformity with the final decree of the court."

[2] The statute has in purview, no doubt, adverse claimants who are seeking title from the government to the same parcel of government land, and it is incumbent upon the contestants to show by what right they respectively claim superiority each over his adversary. The final judgment of the court will determine the respective rights of the parties, and the final patent is made dependent upon the result of such adjudication. The statute has its prototype in the statutes providing for the acquisition of mineral lands. Section 2326, Revised Statutes (U. S. Comp. St. 1901, p. 1430), provides for an action of

the kind in case of contest between applicants for the same tract of mineral land. This section was amended March 3, 1881 (21 Stat. 505, c. 140), so that if, in any action brought in pursuance thereof, the title to the ground in controversy be not established by either party, the costs shall not be allowed to either party. While there exists no such amendment or provision with respect to the statute under which this suit is instituted, yet it would seem to be the reasonable course under like conditions. The reference to the courts of the controversy under the statute is in aid of the Land Department, and such form of suit or action may be adopted as would seem most appropriate to meet the exigencies of the case. Perego v. Dodge, 163 U. S. 160, 164, 16 Sup. Ct. 971, 41 L. Ed. 113.

In the case at bar the defendant, Ripinsky, is claiming by right of a homestead entry, with possession dating back to about December 2, 1897, derived from Sarah Dickinson. On the other hand, complainants are claiming possession with a view to obtaining title from the government under the town-site statutes. Lands in Alaska may be entered for town-site purposes, for the several use and benefit of the occupants, by such trustee or trustees as may be named by the Secretary of the Interior for that purpose, such entries to be made under the provisions of section 2387 of the. Revised Statutes (U. S. Comp. St. 1901, p. 1457) as near as may be, and, when such entries shall have been made, it is made the duty of the Secretary of the Interior to provide for the proper execution of the trust. 26 Stat. 1099, 1 Fed. Stat. Ann. 53. Section 2387, Revised Statutes, provides that whenever any portion .of the public lands has been or may be settled upon and occupied as a town site, not subject to entry under the agricultural pre-emption laws, the corporate authorities, if the town be incorporated, and, if not, the county judge, are empowered to enter the land settled upon and occupied, in trust, for the several use and benefit of the occupants, according to their respective interests. Under these statutes, the initiatory steps to be taken by citizens in establishing a town site upon public land are to settle upon and occupy the land for town-site purposes. When so occupied, they may have the same entered in the Land Office for such purposes, through a trustee or trustees named by the Secretary of the Interior, by whom it is entered in trust for the settlers and occupants.

The plaintiffs by their bill of complaint aver settlement and occupancy, dating from December, 1897, and prior in time to the occupancy of the defendant, of the larger portion of the lands embraced in defendant's homestead survey No. 573, and that they have applied to the proper officers in the United States Land Office for a survey of such lands for the purpose of entering the same as a town site under the laws of the United States.

[3] The question is again presented here, as it was on the first appeal, whether the plaintiffs were entitled to join in a bill of complaint in aid of the contest against the issuance of a patent to the defendant under his homestead application therefor. Ripinsky v. Hinchman, 181 Fed. 786; 105 C. C. A. 462. As the cause was then presented, which was in the way of an ordinary suit to quiet title, it was held that such

joinder was not permissible. The case now comes here in a very different aspect. The complaint shows a cause in aid of the complainants' contest in the Land Office against the claim of Ripinsky for a homestead patent.

It is undoubtedly proper and regular under the statute for the settlers and occupants to petition the Secretary of the Interior to name a trustee or trustees to enter the lands so occupied for town-site purposes, who, when so named, would become the trustee or trustees for all, and thereafter administer the trust for all. There exists no good reason why they should not also join in a suit for contest against the issuance of patent prior to the time when a trustee or trustees may be named by the Secretary of the Interior for making such entry for town-site purposes. After the trustees are named and entry made, then the trustees would very properly represent the settlers and occupants. Ashby v. Hall, 119 U. S. 526, 7 Sup. Ct. 308, 30 L. Ed. 469; Martin v. Hoff, 7 Ariz. 247, 64 Pac. 445. We think, in the present state of the record, it was appropriate for the alleged settlers and occupants to join in the bill of complaint for the particular relief sought.

This brings us to a consideration of the relative rights of the parties contestant. The manner and character of plaintiffs' settlement, occupancy, and holding are sufficiently set out in the opinion heretofore rendered (181 Fed. 789, 105 C. C. A. 462, et seq.), and it is unnecessary that we should do more at this time than to refer to what is there stated upon the subject, except to say that a letter was offered in evidence on the last trial, from the Commissioner of the General Land Office to the United States Surveyor General of Alaska, whereby it appears that George Vogel and 57 other settlers at Haines petitioned for a survey of the boundaries of the town site, which petition had been favorably considered, but advising that further action in the way of making a survey "should be contingent upon the action that may be taken upon a homestead entry that may be made by Sol Ripinsky under survey No. 573." This letter bears date July 17, 1905. It is apparent, therefore, that plaintiffs had proceeded as far as they could in the Land Office when the contest was brought on. Their rights for the establishment of a town site were still initiatory, and had not proceeded further than the filing of a petition for an official survey for a boundary thereof. They had in no way as yet established a right to a patent from the government.

[4] Let us now consider the rights of Ripinsky, the defendant, as acquired under his homestead application, to entitle him to a patent, and determine whether they are superior to the rights of complainants, and, if so, in what respect.

In 1878 George Dickinson, at the time married to an Indian woman named Sarah, being the representative of the Northwest Trading Company, established a trading post at Portage Cove, now known as Haines. He located a tract of land for the company for trading purposes, and erected the buildings now occupied by the defendant. At Dickinson's request, an officer of the United States steamship Jamestown surveyed the tract so located and set the corner posts. It is in evidence that Dickinson constructed an inclosure around the tract,

consisting partly of brush and rails on the south line, and the balance of a single galvanized wire. The lines were also blazed, as they ran mostly through the timber, and a small portion of the ground was cleared and used for garden purposes. In 1880 Dickinson succeeded to the interest of the Trading Company, and continued to occupy the buildings until his death in 1888. He left surviving him his wife, Sarah Dickinson, and a son and daughter, William and Sarah. The widow and son and daughter continued to occupy the buildings and to carry on the business until December, 1897. On December 2d of that year Mrs. Dickinson executed a deed to Ripinsky, describing the premises conveyed as follows:

"Both buildings and all the land adjoining the Presbyterian Mission grounds, situate at Haines Mission, Alaska, except one acre of land claimed by Mrs. J. Dalton. All the above property was left to me by my deceased husband, George Dickinson, and was known as the Dickinson property, which I will defend against all claims. Adjoining the Mission grounds on the south and the Indian village on the north."

Whether Ripinsky went into possession at once is a matter in dispute; but a little later William Dickinson forcibly entered, and maintained possession with force until Ripinsky compromised with him by paying him $50, and acquired a deed from him bearing date December 21, 1897, containing the following description:

"Both landings and fifteen acres of land adjoining the Presbyterian Mission grounds, situate at Haines Mission, Alaska, except one acre of land claimed by J. Dalton."

It is claimed by Ripinsky that he took immediate possession of the property upon receiving the deed from Mrs. Dickinson, ran a two-wire fence about the land, and has continued in possession ever since, except as dispossessed by the complainants without right.

The real controversy hinges about the question of prior possession as between the parties litigant. We are but little concerned with the manner of conveyance from the Northwest Trading Company to Dickinson, and from Sarah and William Dickinson to Ripinsky. It is sufficient to inquire respecting the transfer of possession.

Ripinsky relates that when he came to trade with Mrs. Dickinson—who was an Indian woman, a native of Alaska, of superior intelligence, with sufficient knowledge of the English language to act as interpreter for the natives—she told him that she had 16 acres of land, less one acre which she had sold to Dalton; that George Dickinson told him, previous to his death, that he had 16 acres, and showed him the posts established about the boundaries. He attempted to locate the position of the stakes on the map, Plaintiffs' Exhibit 1, which was offered in evidence. One he fixed as being near Sixth avenue, but was indefinite about it, and two others he located at the east end of the tract. He further relates that, right after he obtained the deed from Mrs. Dickinson, he ran a fence, consisting of two barbed wires and posts, around the tract; that his brother and some Indians did the work, after he had shown them the lines, and that the fence extended back from the beach westerly 2,400 feet, a little more or less, and that there was not a soul upon the tract other than himself and those work-

ing for him at the time; that the fence remained until the rush of people came in the fall of 1898, who overran the property, tore the fence down, and began their settlement; and, further, that he protested to these people that they were upon his premises. Later, to wit, in 1903, he sent registered letters to persons exercising possession, warning them off, and of his claim.

Ripinsky filed his homestead location June 23, 1903, and an amended notice December 18, 1905, whereby he claimed actual, personal, and continuous occupation and settlement since the month of December, 1897. In the meantime survey No. 573 was made, which was approved by the Surveyor General of Alaska, and later duly filed in the United States Land Office.

On cross-examination Ripinsky states that George Dickinson first showed him the corners of the tract in 1886, and said he was going to clear it, and that he did not know whether that tract contained a good deal more territory than the one in question. He further states that, in showing him the land, Dickinson went along up the Indian trail, now occupied by Main street, "up to Sixth avenue somewhere," and showed him the corner post there, a square post about four feet high, but that he saw no marks upon it; from there they went northerly, somewhere about Sixth avenue, then "over some place to Dalton street," he supposes to where the northwest corner of block No. 5 is now located, and found a corner post, an old one, which might have been there 10 or 15 years; from there they went through the large timber to the locality of the buildings, where Dickinson had a garden, warehouse, storehouse, and woodyard. He further states that Mrs. Dickinson took him out and showed him the corner stakes before he bought, when "Billy" went along, and that he went around the entire tract "lots of times"; that when he got the land he fenced it, beginning the next day; that "perhaps"—using his language—"he [his brother] was fencing one side and I was fencing the other side"; that his brother had natives with him, and he (witness) also had some natives with him; that he attached the wires to trees where convenient, and put posts in elsewhere; that he engaged in building the southern part of the fence; that there was some snow on the ground, and in some places the ground was frozen hard, and that they dug the post holes with pick and shovel. When asked to give the names of the natives who assisted in building the fence, he mentioned "Willy" and "John Jack," both of whom he declared were dead, and further declared:

"We had lots of them. Pretty near all of the natives have died out. There was an epidemic."

Then he said, "We had Adolph;" that prior to the fall of 1898 the fence was nearly all standing, and that in the summer or fall they began tearing it down, but that nearly all the fence was standing in the summer of 1898, and that it was a two-wire fence. When asked why he did not join onto the Misson fence, he answered, "There ought to be a trail so people could walk." It further appeared that he brought an ejectment in the District Court of Alaska, at Sitka, in

.1899, against several of the settlers, alleging prior occupancy and possession, and was defeated.

M. Ripin, a brother of defendant, Ripinsky, but having had his name changed, testified that he fenced the tract off from Blind Isaac's, called Dalton street, "away up around and down to the Mission"; that he did not build the fence along the trail on the south side, and that he had seen the fence after it was completed "all around"; that it was probably eight or ten days after his brother bought from Mrs. Dickinson when he began on the building of the fence; that he did not fence the tract as the lines were run by survey No. 573, but ran the fence straight up from Blind Isaac's, and did not inclose the Dalton acre; that neither Mr. Fay nor any one else occupied the land at the time, and the last time he saw the fence was in the middle of January, 1898; that he saw the place after the Porcupine rush in July or August, 1898, and the fence was all broken down, except where Blind Isaac lived, where it was standing pretty well; that he did not go over to the west end of the tract, and could not tell about the fence there; that he heard Mrs. Dickinson say that she sold 15 acres to Ripinsky; that he ran the fence away up to pretty near where the sawmill is, which he thinks is up where Sixth avenue is, and about 300 feet from the Mission line; and that he at one time warned off a man who was building a house for Carl Wilson.

On cross-examination he states that a white man whom they called "Adolph" and a half dozen natives helped him to build the fence; that he guessed the natives were yet in Haines; that it must have been the 10th or 12th of December when he built the fence; that he helped two days in building the fence, and guessed that it took the parties two weeks to build it; that he came over from Chilkat to Haines every other day and saw the natives building the fence; that the fence was there in the spring of 1898, and part of it in the summer—it was in the summer that people began to break it down; that there is no sign of it there now, and has not been for eight or nine years; that his brother got the wire with which to build the fence from Mr. Warne, the Presbyterian missionary, and that he saw the corner post over by the sawmill. When asked for a description of the post, he answered that he guessed it was a "regular post from a tree," and that when he saw it the fence had been built right up to it. Being further asked, "Now, you don't know whether there was a corner post there before the fence was built, or not?" he answered, "I guess there wasn't." He further states that he saw the southeast corner post also, which was after the fence was built, and that he helped build that fence.

Franklin A. Rogers testifies that he was a resident of Haines from May 8 to the last of November, 1896, and from April, 1897, to January, 1898, and off and on to May of that year; that when he went to Haines in 1896 he was informed that the two buildings and ground belonged to Mrs. Dickinson, and that it was the old trading post while Mr. Dickinson was alive; that they lived and had a store in the building next to the Mission, that the second one was the warehouse, and that all the time he was there he never heard it called by any other name than the Dickinson property. He says that Mrs. Dickinson and

William told him that it extended from the north line of the Mission north to Blind Isaac's, less the corner of one acre sold to Dalton, and, from the water on the east, west to embrace 15 acres, and that he went over with Solomon Ripinsky what he said included 15 acres; that the land would have to run from tide water west about 2,500 feet to make 15 acres; that he does not know whether the Dickinson tract was ever fenced or not, but that a portion on the east had been used for a garden and was fenced when he went there in 1896; that he assisted Ripinsky in negotiating the purchase from Mrs. Dickinson; that he had the deed recorded on December 13th; that on the 21st William, the son, had broken into the store building, and that he (witness) brought about a compromise between him and Ripinsky, when William gave the latter a deed to his interest in the premises; that at the time of the transaction with Ripinsky W. W. Warne had a piece of land staked off, which had a notice of claim posted on it; that witness staked off 200x200 feet for himself, and put up a notice which bore date December 7th, and was recorded December 18th; that when he returned from Dyea, on December 19th, he told Warne that Ripinsky had bought Mrs. Dickinson's right; that he (witness) staked out a piece for Miss Manning; that after he had been around the tract with "Billy" Dickinson, he told Mrs. Campbell (née Manning) that part of her piece, his own, Mr. Warne's, Miss McPherson's, and four or five other claims were on the land Mrs. Dickinson had sold to Ripinsky, and told Warne that Ripinsky could claim the "whole business," and that he told Al James and one other party the same; that there were no buildings put on any of the land claimed by Mrs. Dickinson when he (witness) ran the wire fence about his own lot, and when Ripinsky made his claim known and ran his wire around the entire place, including all of Warne's, the witness', Miss Manning's, Al James' and one other on the west; that Ripinsky warned all of them not to put anything on the land, as it was his, but told witness to leave his be as it was, and that he should have it, and to tell Miss Manning the same as to hers; that Spooner was building on the Dalton acre at the time; that witness did no more on his piece, for he was satisfied that it was in the 15-acre tract, and left, trusting "the colonel" to do as he agreed; that the others paid no attention to what he told them, but kept on improving and putting buildings up on the land.

William Dickinson testifies that his father took up ground for the Northwest Trading Company, 40 acres, and also 160 acres for the Mission, the former of which adjoined the latter on the north; that his father put out the posts around his 40 acres; that one of the officers came off the Jamestown and surveyed it, and he and his father put up a single wire fence about it; that they put out three posts—four including the rock at the Mission grounds; that the galvanized wire was put up, and the trees blazed along the way to show the lines; that two posts were set at the west end, one at each corner; that one of them was about six feet long, and close to the Vogel mill, about 100 to 150 feet towards the mountain back of Haines; that he and his mother sold the property they claimed at Haines to Ripinsky; and that

since they sold, at the request of Ripinsky, he (witness) showed Ripinsky the stakes that his father set out.

On cross-examination he relates that the survey for the Trading Company was made in 1878 or 1879, when he was 14 or 15 years old, though a little later he says he was but 11 or 12 years old; that the clearing went farther back than the fence around the garden—that is, beyond where Vogel's building now is—which is on Second avenue; that the tract that was cleared was 300 feet wide, more or less, from the beach; that the posts that were put out by his father and the surveyor included the same tract since conveyed to Ripinsky, with the exception of the Dalton acre and the Blind Isaac tract, and are the same posts that he showed to Ripinsky; that the two westerly posts are in exactly the same place as set by his father and the surveyor, and the same that he showed to Ripinsky; that the southwest corner of the tract was marked by a tree, and the marking was carved on it, and the tree was there when he sold to Ripinsky; that the tract designated by the posts was supposed to contain 40 acres, more or less—that was his understanding; that the galvanized wire fence was constructed about the tract right after the lines were blazed, and that some of the fence was there yet when he showed the lines to Ripinsky; that "there wasn't any on the trail that run to Indu-stuckee, and there was pieces you could see laying over bushes, and there was a piece hanging to the posts, the northwest corner post, and there was a piece hanging on the southwest corner you call it, the lower part towards where the Post is now." Witness continues that at the time he sold to Ripinsky no one was on the ground, and that he showed Ripinsky the posts when he sold his share.

In refutation of this testimony, tending to show the construction of the alleged inclosures about this tract of land, are many witnesses; one class testifying that they went upon the premises beginning December 14, 1897, and continuing through December of 1897 and January and February of 1898, and made lot locations, and settled upon and occupied the premises for dwelling and business purposes. To such an extent was this lot location and settlement carried on that a survey was made and a town-site map prepared, which bears date January 29, 1898, known as the "Fogelstrom Map." This aside from the testimony of Rogers, whereby it appears that Miss Manning and others located certain lots upon the tract in question for trade and business purposes, which they refused to relinquish, notwithstanding the claim of Ripinsky. And another class testifying that, although they were upon this tract in December, 1897, and in January and February, 1898, and throughout that year, they saw nothing of any fencing about it, except such as inclosed the garden and along the Mission tract, extending westerly to Second avenue.

It would be strange, if such an inclosure had been constructed as Ripinsky claims, that so many witnesses could be found, who had ample opportunity of observing the premises, to testify that they saw no sign of such an inclosure. There is much confusion with defendant's own witnesses as to the construction of the inclosure. While Ripinsky and his brother say that they constructed the inclosure, and

Rogers that he saw it after it was put up, Ripinsky says it was constructed at once after he traded with Mrs. Dickinson, and his brother is positive that it was about the 10th to the 12th of December that he was engaged in his part of the work. In this particular, both must be in error, if they built the fence at all, for Ripinsky could not maintain possession until he settled with William Dickinson, which was not until December 21, 1897. The deed fixes the date of that transaction, and William Dickinson swears that he did not even show Ripinsky the boundaries until after that settlement. Then it must have been after that time that the two-wire fence was constructed, which, taking two weeks to do the work, would run it into January. Within that time there were a number of persons who located lots within the tract, and none were found to say that any inclosure was so constructed. Again, Ripinsky seems to think that they did not interfere with his inclosure until the summer of 1898, at the time of the Porcupine excitement. If that be true, the inclosure, or some part of it, should have been seen by some, at least, of the many persons who took up lots and made settlement upon the town site of Haines. Fifteen acres is not so large a tract of ground that its boundaries would entirely escape the notice of all persons settling within its confines. The tract at its widest part, the original tract claimed before survey No. 573 was made, was not to exceed 270 or 280 feet, and was less than one-half mile in length. But Rogers' testimony shows that Miss Manning, Warne, and others laid claim to certain portions of the tract before there could have been any fence constructed, even before any deed was passed from William Dickinson to Ripinsky, and these refused to recognize Ripinsky's claim of right. This is borne out by the fact that Miss Manning, and even Rogers himself, posted notices of claim for trade and manufacturing purposes on December 7th, and Warne and wife and Bigford filed like notices on December 15th. And they continued the locations for dwelling, business, and town-site purposes. Another feature about the testimony respecting the construction of the fence is that Ripinsky has not produced any of the Indians who, he claims, helped in constructing it. Ripinsky's brother said he guessed such Indians were living in Haines when his testimony was being taken, and Ripinsky says they are all dead; all this as it may bear upon the credibility of Ripinsky and his brother in affirming that the inclosure was constructed.

It is necessary, in maintaining right to a patent under homestead entry, to show that the claimant is holding by right of prior and continued possession, unless dispossessed by persons of inferior right. The evidence touching the possession of this tract of 15 acres prior to the entry of Ripinsky is very meager. The only testimony of actual occupancy, outside of the buildings and the garden spot, is that of William Dickinson to the effect that the land was surveyed, the lines blazed, posts set at the corners, and a galvanized wire stretched about the entire tract. He was but 11 or 12 years old at the time this was done, and thinks that the survey contained 40 acres. When he showed Ripinsky the corners, he says he saw some pieces of the old wire hanging from one or two of the posts, and some along through

the brush; but Ripinsky testifies to no such condition. Whether William is right about it or not, it is very evident that this fence was not maintained. The tract, outside of the garden spot and a little clearing to the west, was heavily wooded, and no clearing was attempted of that part, and apparently no use made of it whatever. That fence is supposed to have been constructed in 1886 or 1887, 10 or 11 years before the sale to Ripinsky and his alleged occupancy. It fell into such disuse that nearly, if not quite, the last vestige of it had disappeared. The corner posts, if rightly located, only remained, and it is problematical whether they were really identified. Outside of the survey, and the construction of this single wire fence, there is no evidence whatever of the exercise of any ownership or possession by Mrs. Dickinson or her predecessors over this part of the tract in question.

Now, it may be, but it seems hardly credible, that Ripinsky constructed the fence he describes; but, if so, it was subsequent to a time that others—numerous others—were laying claim to parcels of the tract, and were in occupancy by settlement and otherwise. Ripinsky claims to have derived possession from Mrs. Dickinson and William. But Mrs. Dickinson and William had no actual or even constructive possession when they sold to Ripinsky. (We refer here to the land outside of the buildings, the garden spot, and some clearing to the west.) Hence Ripinsky must depend upon himself having initiated possession such as will support his homestead application. It may be further mentioned that Ripinsky instituted a possessory action against a number of these claimants in 1899, in the District Court of Alaska, at Sitka, and was then defeated in a trial before a jury.

We find that the possession of numerous others was prior to Ripinsky's, and has so continued, so that it cannot be maintained that he has a prior and superior right. Not having such right, he is without that quality of possession which will support his homestead entry. We find, however, that he acquired and has maintained possession of the land immediately about his building, including the garden spot and somewhat to the west, and the cleared land to the eastern boundary of the town of Haines, as shown by the map prepared by Davidson, introduced in evidence and marked "Plaintiffs' Exhibit 1." The tract of which he has been thus possessed may be described by beginning at corner No. 1 of survey No. 573, and running thence north 14° 20′ east 151.8 feet to corner No. 2; thence west 283.4 feet to the east boundary of the town of Haines as shown by the Davidson map, "Plaintiffs' Exhibit 1;" thence southwesterly along the east boundary line of said survey to a point due west of the place of beginning; thence east 269.6 feet to the place of beginning. As to this tract Ripinsky is entitled to his patent. As to the balance of his claim, he must fail. The plaintiffs have established no right to a patent from the government in any respect.

Costs will be awarded plaintiffs and appellants Hinchman et al. in the court below, both trials, and upon this the second appeal in cases Nos. 2,045 and 2,015, but not in the first appeal, the costs wherein were awarded to defendant and appellee Ripinsky by the former judg-

ment of·.this court; and costs will be awarded defendant and appellee Ripinsky in case No. 1,993, both in the court below and upon this appeal.