UNITED STATES v. 10.95 ACRES OF LAND
IN JUNEAU et al.

No. 4943-A.

District Court, Alaska, Third Div. Juneau.
March 11, 1948.

Patrick J. Gilmore, Jr., U. S. Atty., Stanley Baskin, Asst. U. S. Atty., and Robert Boochever, Special Asst. U. S. Atty., all of Juneau, Alaska, for plaintiff.

William L. Paul, Jr., of Juneau, Alaska, for defendants.

FOLTA, District Judge.

Plaintiff seeks to condemn 10.95 acres of land, most of which at the time of taking on September 19, 1942, consisted of tide land near the Indian Village in the City of Juneau.

Defendants Miller et al., who are Indians residing in the village, filed their answer in which they alleged that: "Ever since the year 1867, * * * said claimants, * * * and their predecessors * * * have been, and now are the aboriginal users and occupants of, and in the exclusive possession of, and entitled to the exclusive possession of the land, submerged land and water described * * *."

From an order sustaining plaintiff's demurrer to this answer, defendants appealed. The Circuit Court of Appeals reversed, Miller v. United States, 9 Cir., 159 F.2d 997, holding that, while the defendants could not recover under their theory of aboriginal title, because of the extinguishment thereof by the Treaty of Cession, 15 Stat. 539, the allegations of their answer were nevertheless broad enough to include a claim of possessory rights under Sec. 8 of the Act of May 17, 1884, 23 Stat. 26, which provides: "That the Indians or other persons in said district (territory) shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons

842

may acquire title to such lands is reserved for future legislation by Congress."

Upon remand the plaintiff amended its complaint to embrace an additional area, inadvertently omitted from the description in the complaint, to which defendants have filed an answer differing from its predecessor only in that it alleges that the value of the adjacent tidelands also claimed by them was reduced by reason of the taking of the area described in the complaint. Thus the principal questions upon the hearing were: (1) whether the defendants and their predecessors in interest had, from May 17, 1884, to September 19, 1942, continuously used or occupied the tidelands described in plaintiff's complaint, and the adjacent tidelands the value of which defendants allege was reduced by reason of the taking of the former; and (2) whether such depreciation in value followed.

The evidence may be summarized as follows: In the summer of 1880 Joe Juneau and Dick Harris, the founders of Juneau, arrived at the Indian Village, around which the City of Juneau was subsequently built, and in October discovered gold in what has since been named Gold Creek, which at that time emptied into Gastineau Channel near the westerly end of the village. There were a few smoke houses and what have been referred to as fish camps on the banks of Gold Creek, but the village was situated to the easterly thereof and was built, for easy access to tidewater, just above the high tide line. The residents of the village were members of the Auke Tribe which also maintained, in accordance with the customs of the Tlingits, a winter village 15 miles from Juneau in Auke Bay. In the fall the Indians would leave the village in Juneau and go into winter quarters and return, as one witness put it, when the buds were out the following spring.

Following the discovery of gold there was a great influx of whites into Juneau, and sometime later ,when lumber was produced locally, the village was rebuilt on its original site, except that all the houses were built in one row along the shore, whereas some of the huts had previously been built on the hillside. The tideland area used by the Indians at that time was, roughly speaking, trapezoidal in form, approximately 800 feet in width at its northern end upon which the village fronted, 1000 feet in width at its southern end at the line of low tide, and about 1250 feet long. It was bounded on the north by the village, on the east by the shore of Gastineau Channel, on the south by the deep water of the same channel, and on the west by Gold Creek. Every family had a dugout canoe and these, as well as the large canoes, were kept on the tideland in front of the village. Later these gave way to power boats which were moored at various places on the tidelands referred to and anchored near or in deep water approximately 500 yards south of the village. There were no encroachments on the tideland claimed by defendants and their ancestors until the city spread north along the water front and it was found necessary in 1914 to extend Willoughby Avenue. This was done by constructing a pile trestle northward along the easterly shore of the tideland area to within a hundred yards of the village and thence in a westerly direction across the tideland area to that part of the city which lay to the west and northwest of the village. This pile structure, while not interfering appreciably with the use of canoes and small boats, constituted, so far as power boats are concerned, an effective barrier. However, after 1934, when the pile trestle was replaced by a rock fill, small boats could reach the village from deep water only through culverts placed underneath, Willoughby Avenue preparatory to making the fill. About the time Willoughby Avenue was extended over the tide flats in 1914, Pemmer's Wharf, extending into Gastineau Channel in a westerly direction, was constructed below the line of low tide, and in about 1928 the plaintiff built its wharf which, to all appearances, was merely an extension of Femmer's Wharf parallel to and below the low tide line, thus barring to a considerable extent access to the tideland area from the south. In 1936, when the Standard Oil Company built its

wharf, the face of which was in line with that of plaintiff's wharf, and connected it with an approach consisting of a rock fill extending northward to the upland, the tideland area was sealed off from access to deep water except for a channel left between the westerly end of the plaintiff's wharf and the easterly end of the Standard Oil Wharf. On September 19, 1942, acting under its war powers, the plaintiff went into the possession of and filled in the area described in the complaint, referred to in the testimony and in this opinion as the "subport area," and constructed thereon what is known as the Juneau Subport of Embarkation. This fill, except for the causeway extending northward to Willoughby Avenue is, roughly speaking, square in shape and adjoins plaintiff's wharf on the south. At about that time plaintiff, at the request, or at least with the consent of the residents of the village, similarly filled in the tideland area lying between the village on the north and Willoughby Avenue on the south. In 1943 plaintiff acting again under its war powers went into the possession of the tidelands lying between Willoughby Avenue on the north and east, the subport area on the south, and the causeway on the west, and filled, roughly speaking, the northern half thereof in connection with the construction of a federal housing project. Access to the lower half of this area is difficult because of the causeway. The tideland which now remains is that lying between Willougby Avenue on the north, the causeway on the east, the subport area on the south, and the approach to the Standard Oil Wharf on the west. It is this particular area which the defendants allege has, by reason of the taking of the subport area, been reduced in value. This was referred to in the testimony as the "contiguous" area, and will be so referred to herein.

■ The evidence relating to use and occupancy was not confined to the subport area and the so-called contiguous area, but related to the entire area of tidelands which the defendants allege they originally used. Consequently, it is impossible to determine how much of the evidence relates to the subport area or the contiguous area, but this is of no great moment, for the evidence wholly fails to prove a continuous use or occupancy from May 17, 1884, to September 19, 1942, of any part of the subport or the contiguous area. Such as it is, it tends to show that the defendants, or their ancestors and predecessors in interest, gathered shellfish below the line of low tide, which, it was shown, ran parallel to and about 25 feet north of plaintiff's wharf, until the discharge of sewage and the presence of oil befouled the waters; that boats were navigated at high tide over the subport area; that after power boats came into use at about the time of the First World War boats were anchored in the easterly portion of the subport area; but, that since the area was not sheltered from wind and seas, many of the boats were moored at the City Float following its construction a few years later, and then upon the completion of the Small Boat Harbor in 1938, with the usual facilities for berthing and servicing, they were kept there. It was also shown that most of the boat owners have since died. Obviously, such uses were merely in the exercise of the common right of fishery and of public navigation, and afford no basis for the claim of possessory rights, People v. Batchelder, 27 Cal. 69, 85 Am.Dec. 231, even though continuity and definable area have been shown.

However, some competent evidence of use and occupancy was introduced. It related to the driving in 1916 and subsequent maintenance of piles and dolphins, some of them in the subport area, for mooring boats and logs, but again the requirement of continuity was not met. Evidence relating to the use of sunken boxes for soaking dried fish was similarly defective. The remainder of the testimony related to the use of tidelands adjacent to the village, before that area was filled in, and to tideland east of the causeway which remains unfilled, neither of which area is involved in the present suit.

■ When the defendants rested, plaintiff moved for a dismissal on the ground that the evidence is insufficient to show the existence of any possessory right in the defendants, or any of them, on September 19, 1942, under Sec. 8 of the Act of May 17, 1884. A possessory right of this kind constitutes a compensable interest.

844

Miller v. United States, 9 Cir., 159 F.2d 997, 1006. But the use or occupancy which gives rise to such a right must be notorious, exclusive and continuous, and of such a nature as to leave visible evidence thereof so as to put strangers upon notice that the land is in the use or occupancy of another, and the extent thereof must be reasonably apparent. Cramer v. United States, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622; Carroll v. Price, D.C., Alaska, 81 F. 137; Johnson v. Pacific Coast S. S. Co., 2 Alaska 224; Haines Wharf Co. v. Dalton, 1 Alaska 555; Sutter v. Heckman, 1 Alaska 188, affd. 9 Cir., 119 F. 83; Gordon v. Ross–Higgins Co., 9 Cir., 162 F. 637; Hinchman v. Ripinsky, 3 Alaska 543, 557, and 9 Cir., 202 F. 625; Young v. Fitzgerald, 4 Alaska 52; McFarland v. Culbertson, 2 Nev. 280, 282; Garrison v. Sampson, 15 Cal. 93; Coryell v. Cain, 16 Cal. 567; Lechler v. Chapin, 12 Nev. 65; Schnepel v. Mellen, 3 Mont. 118, 134, 135.

 It is impossible to determine from the testimony whether the defendants claim possessory rights as individuals or as a community. The argument made in their behalf would indicate that they have not entirely divorced themselves from the theory of aboriginal title originally interposed and disposed of adversely to them by the appellate court. Thus it was argued that the Act of May 17, 1884, did not create any rights in the aboriginal inhabitants and their descendants, but was merely declaratory of rights which were theirs by virtue of immemorial possession; and that the navigation of boats over, and the gathering of shellfish within, the subport area were acts done not merely in the exercise of the public right of navigation and of the common right of fishery, but as incidents of their absolute ownership of the water and land. Manifestly this is more than the assertion of mere aboriginal title. It is the assertion of sovereign title in themselves as against the United States. Suffice it to say that inquiry into this question is foreclosed by settled principles of international law. But if this argument was made merely by way of emphasis for the purpose of contrast or to furnish a background for the more modest claim of aboriginal title, it would still not merit serious consideration or extended discussion, because the decision of the Circuit Court of Appeals that such title was extinguished by the Treaty of Cession is now the law of the case. Whatever may be said, however, as to the sufficiency of the testimony to establish aboriginal title, it is wholly inadequate to establish a possessory right under the Act referred to. Manifestly if navigating and anchoring boats and gathering shellfish, without more, are sufficient, it is doubtful whether the future state will come into the possession of any tideland whatever upon admission into the Union.

 No attempt was made to prove succession, whether by way of transfer, devise or descent, and since it is conceded that the Indians' mode of life underwent profound change after the discovery of gold near Juneau, with a corresponding change in the use thereafter made of the tidelands, it is not improbable that a use previously made was not continued, at least by the present generation, or that a use thereafter made was not one that had been initiated on or before May 17, 1884. This failure to prove succession would appear to further justify the presumption that defendants have proceeded on the theory of aboriginal rights. Indeed the only authority cited by defendants is Johnson v. McIntosh, 8 Wheat. 543, 5 L.Ed. 681, which dealt exclusively with Indian title. It is not surprising, therefore, that the evidence not only fails to show continuity but also the extent of the use or occupancy sufficiently to put a stranger on notice or enable the Court to fix the boundaries or the area thereof as to the defendants or any one of them. Moreover, the clause in that Act, "or now claimed by them," cannot be construed to render a mere assertion of a claim sufficient. Sutter v. Heckman, 1 Alaska 188, 200; People v. Frisbie, 31 Cal. 146.

It is clear that both upon principle and authority the motion should be granted, and it is so ordered.