DELAWARE TRIBE OF INDIANS
v.
The UNITED STATES.

ABSENTEE DELAWARE TRIBE OF OKLAHOMA, DELAWARE NATION, ex rel. W. E. EXENDINE and Myrtle Holder,
v.
The UNITED STATES.
Appeal Nos. 2–54, 3–54.

United States Court of Claims.
Feb. 8, 1955.

E. O. Patterson, Tulsa, Okl., for appellant, Delaware Tribe of Indians. Wesley E. Disney and Charles B. Rogers, Tulsa, Okl., on the brief.

Richard Schifter, Washington, D. C., for appellant, Absentee Delaware Tribe of Oklahoma, Delaware Nation, ex rel. W. E. Exendine and Myrtle Holder. Stanford Clinton, Chicago, Ill., on the briefs.

Ralph A. Barney, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for appellee. J. Edward Williams, Washington, D. C., on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

These are appeals from decisions of the Indian Claims Commission, Docket Nos. 27–A and 241. See 2 Ind.Cl.Com. p. 253; id. p. 536. Both the Delaware Tribe of Indians and the Absentee Tribe of Oklahoma, Delaware Nation, appeal from the Commission's dismissal of their petitions. This feature of the case will be considered first. Another aspect of the case, in which the two groups of Indians are in disagreement, will be referred to later.

Both groups of Indians, in their petitions to the Indian Claims Commission, alleged that the consideration of $10,000 paid by the United States to the Delawares, in the Treaty of May 6, 1854, 10 Stat. 1048, for the land of the so-called "Delaware Outlet", was unconscionable. The Absentee Tribe also alleged that the transaction was a departure from fair and honorable dealing.

The Commission decided that the interest of the Delawares in the outlet was a "mere easement", and not the full Indian title which the petitioners asserted that it was, and therefore dismissed the petitions.

The Delaware Indians were originally on the eastern seaboard, but by the year 1818 they were in the middle west, principally, it seems, in Indiana. By the Treaty of October 3, 1818, 7 Stat. 188, they ceded to the United States all their claims to land in Indiana, and the United States agreed to give them in return land west of the Mississippi. A satisfactory location was found in what is now the State of Kansas, and a treaty was made with them on September 24, 1829, 7 Stat. 327. By that treaty the Delawares agreed to remove from the place in Missouri where they were temporarily located to an area in Kansas in the fork of the Kansas and Missouri Rivers

"* * * extending up the Kansas River, to the Kansas [Reservation] Line, and up the Missouri River to Camp Leavenworth, and thence by a line drawn westwardly, leaving a space ten miles wide, north of the Kansas boundary line, for an outlet; [which] shall be conveyed and forever secured by the United States, to the said Delaware Nation, as their permanent residence: And the United States hereby pledges the faith of the government to guarantee to the said Delaware Nation forever, the quiet and peaceable possession and undisturbed enjoyment of the same, against the claims and assaults of all and every other people whatever."

The land described in the treaty was surveyed and marked, except that no closing line on the western end of the outlet strip was surveyed or marked. The Delawares settled in the part of the land east of the outlet strip and hunted in and through that strip. Their activities in the outlet strip resulted in bloody conflicts between them and the Pawnees, who claimed the same land. The Government thereupon bought the outlet land and other land from the Pawnees, and thereafter there seems to have been no dispute about the use of the outlet land.

The Treaty of May 6, 1854, 10 Stat. 1048, provided:

"The Delaware tribe of Indians hereby cede, relinquish, and quitclaim to the United States, all their right, title, and interest in and to

their country * * * situate in the fork of the Missouri and Kansas rivers * * * and also their right, title, and interest in and to the 'outlet' mentioned and described in said supplementary article; * * *."

Under Article 2 of the treaty the United States agreed "to have the ceded country (excepting the said 'outlet') surveyed" and to sell the land under the public land laws with certain modifications not here relevant. Under Article 3, the Delawares were to receive the proceeds of these lands less the cost of surveying, managing and sale.

Article 3 also provided:

"The United States agree to pay to the Delaware tribe of Indians the sum of ten thousand dollars; and, in consideration thereof, the Delaware tribe of Indians hereby cede, release, and quitclaim to the United States, the said tract of country hereinbefore described as the 'outlet.'"

Under Article 6 it was provided that in gratitude to their old chiefs for their long and faithful services "the sum of ten thousand dollars, the amount provided in the third article as a consideration for the 'outlet', shall be paid to their five chiefs * * *."

The Indian Claims Commission's finding 8, 2 Ind.Cl.Com. 543, is as follows:

"The 'Outlet' provided for the Delaware Indians by the Supplementary Treaty of September 24, 1829, was, according to the custom of the times, intended as a passageway or road to the hunting grounds to the west, and would have been so understood by all parties concerned in 1829. The fact that there was 'no game on the land designed for the residence of the Delaware Indians and that they were going a great distance to hunt' establishes both the necessity and the purpose of the assignment of an 'outlet' to the Delawares."

The Commission's opinion, and its decision, show that it meant by this finding to say that it was understood in 1829 by the parties to the treaty that the Indians were to have something less than Indian ownership of the outlet land. We regret to have to say that we have been unable to find even a scintilla of evidence to support such a finding. The only evidence which the Commission cites to support its finding is defendant's exhibit 5. This document, a letter from the Delaware chief to one Father Cass, has so slight a relation to the finding as to make one wonder if its citation may not have been inadvertent. In the course of a rather long letter, written in 1831, which first expresses satisfaction with the quality of the residence land, and then asked the priest to help obtain the payment of promised annuities to the chief's four sons and one other person, the chief said "There is no game on the land that we are on; for this reason my children are going a great distance to hunt; if their debts were paid as we had thought, they would remain at home and work the land".

This statement of the obvious fact that the game was far to the west of the Delawares' residence, and that if they did not have to make their living by hunting they would work the land where they resided, has no bearing on the nature of the title to the outlet strip. In neither this nor any other case involving Indian ownership of vast acreages of land is it significant that they did not, and were not expected to, settle and live on and cultivate all the land that was in tribal ownership.

Although, as we have said, the Commission cited nothing significant in support of its crucial finding, we have, of course, searched for other evidence which might support it. In House Report No. 27, 20th Congress, 2d Session, entitled "Remove Indians Westward", and submitted by the Committee on Indian Affairs, is reprinted a long and interesting letter from Reverend Isaac McCoy to Honorable P. B. Porter, Secretary of War. Mr. McCoy, a surveyor and explorer, had been, at the direction of the Government, conducting a number of

parties of Indians through the Missouri, Kansas, Arkansas and Oklahoma country, showing them land which they might select as future homes for their tribes. In the course of the letter Mr. McCoy offered some observations and advice as to the way in which the Government was handling its land dealings with the Indians in the area with which Mr. McCoy was concerned. Mr. McCoy's letter said:

"The superabundance of the several claims, and the clashing of claims, are not the only defects of this character in the present system of operation. I suppose that the circumstance of giving to each tribe an *outlet*, so called, is entirely superfluous, and calculated to lead to perplexing difficulties. By *outlet*, is understood a slip of land extending from that more particularly stipulated in the treaty as being designed for settlement, west, into the uninhabitable regions of the desert and the mountains. The Choctaw outlet is about one hundred miles wide. The width of that of the Creeks is not yet settled, on account of the clashing of their claims with those of the Cherokees. That which belongs to both is about one hundred and twenty miles wide. The Osage outlet is fifty miles, and that of the Kanzas thirty miles wide. The object of these outlets is, that each may have access to hunting lands in the west. But why not make those uninhabitable regions a common hunting ground for all? The several hunting parties will not be able to distinguish the particular slip of land allowed for hunting purposes to the tribe to which the party belongs; and even if they could, the hunter, nevertheless, will roam wherever the game is to be found. If metes and bounds be fixed to those hunting lands, trespasses will inevitably be frequent, and may lead to unpleasant consequences."

This communication made in the January before the Treaty of 1829 was made on September 24, shows that Mr. McCoy, as familiar with these transactions as anyone in the Government, did not regard the nature of Indian ownership of "outlet" land as at all different from that of residence land. He speaks of the "outlets" of the Choctaw, Osage, and Kansas Indians. In none of the treaties with those tribes was the word "outlet" or anything resembling it used. As to none of those tribes had it, in 1829, nor has it at any time since, been suggested that their ownership of what Mr. McCoy called their "outlet" land was in any respect different from their ownership of the land on which they resided. As to the Cherokees, a vague provision in a treaty made in 1828, 7 Stat. 311, thus practically contemporaneously with the Delaware treaty, promising them "a perpetual outlet, West" was honored in 1838 by giving them a patent, carrying full Indian title, to some 6,000,000 acres of land lying west of their residence lands. See Cherokee Nation of Indians In Oklahoma ex rel. Western (Old Settler) Cherokee Indians v. United States, 109 F.Supp. 238, 124 Ct.Cl. 127.

What Mr. McCoy was criticizing was the practice of the Government of giving to separate Indian tribes by grant or by permitted reservation, vast acreages of land, west of and in addition to what they needed to live on and cultivate, merely in order to assure them hunting grounds and access to still other hunting grounds farther west. He would have had the Government grant only the residence lands to particular tribes, and make all the land west of the residence lands into a common hunting ground for all the tribes. He said that when the Indians went on their hunts, they would not stay within prescribed boundaries, but would go wherever the game was to be found, and the drawing of artificial lines would not prevent clashes between the hunting parties.

Whatever might have been the wisdom of McCoy's observation, it was, of course, too late to put it fully into effect. The grants to the Choctaws, Kansas and Osages of lands west of their residence lands had been made, and a

similar grant to the Cherokees had been promised. Only by renegotiation of all these arrangements could McCoy's plan have been realized. But the important fact is that McCoy's objection would not have been removed in the slightest degree by assigning a different sort of title to the outlet than to the residence lands. His objection was that you could not keep hunters and game within bound areas marked by a surveyor, and you were only inviting trespasses and armed clashes when you attempted to do so.

It should be noted here that McCoy's suggestion of a common hunting ground was carried out, to the extent that it could be carried out, in 1833. By the Treaty of October 9, 1833, 7 Stat. 448, the Government acquired from the Pawnees, not only the "outlet" which it had granted to the Delawares in 1829, but a large area to the west, which area to the west of the outlet was thereafter to be used as a common hunting ground by the Pawnees, Delawares and all the other friendly Indians in the area, but only at the pleasure of the Government. See Pawnee Indian Tribe v. United States, 109 F.Supp. 860, 124 Ct.Cl. 324, 356.

In the Government's brief at page 18 it says:

"The suggestion in the argument in No. 3–54, p. 37, that because this outlet was only a passageway or road the Indians 'did not have the right to hunt in it' is without any foundation in fact or in law. On the contrary both McCoy (op., p. 562) and Pawnee agent Daugherty (Pet. Ex. 116) refer to hunting by the tribes on their outlet lands."

It is agreed, then, that the Delawares could not only pass through their "outlet" but could hunt on it. We suppose, then, that they could also fish on it, gather berries and edible plants on it, take wood from it, camp on it, and pasture their livestock on it. But those were the only things that Indians ever wanted to do on the lands which they did not live on, and are the only things they have done on lands for which they

have obtained compensation in numerous cases. It is really drawing the line pretty fine to say that the Delawares had the right to do all these things on their lands which they did not live on, but still had a title inferior to that of all the other Indians who did only these same things on their lands which they did not live on. To assume that the twenty Delaware Indians who signed the 1829 treaty, not one of the twenty of whom could even write his own name, understood the legal refinement which is urged by the Government in this case, is to assume the incredible.

It will be remembered that the Treaty of 1829 said:

"* * * And the United States hereby pledges the faith of the government to guarantee to the said Delaware Nation forever, the quiet and peaceable possession and undisturbed enjoyment of the same, against the claims and assaults of all and every other people whatever."

The right to exclude others from all the land covered by the treaty, including the outlet, was asserted with force and arms by the Delawares, and recognized by the United States. Document T, a report by the Commissioners of Indian Affairs to the Secretary of War, dated February 10, 1834, says:

"The attention of the commissioners has been especially directed to the adjustment of the difficulties between the Delawares and Pawnees. The failure to distinguish the rights of the Pawnees and Ottoes to land between the Kanzas and Platte rivers, before assignments were made to emigrating Indians, caused a bloody war among claimants, fighting on one side to defend what had never been relinquished, and, on the other, to maintain what was guaranteed by the Government. * *

"The commissioners, being anxious to remove the cause of war, hastened to obtain a cession of lands from the Pawnees and Ottoes, to

quiet the titles of emigrants who relied with confidence on the guaranty of the Government."

■ The Delawares acquired, then, by the grant to them, the right to do all the things on the land which Indians ever did or wanted to do upon their lands not used by them for residence, and the right to exclude all other persons from being on the land for any purpose whatever. That combination of rights is Indian ownership. These rights they unquestionably had.

■ The Indian Claims Commission said:

"Unless we find an intent to pass something less than full Indian title, the words of grant in this case are clearly sufficient to convey full Indian title to the lands described in the treaty article."

This is, of course, a correct statement of elementary law. An expression of purpose in an otherwise absolute conveyance has not the slightest effect upon the title of the grantee. The language of Chief Justice Marshall, in Worcester v. State of Georgia, 6 Pet. 515, 552, 8 L.Ed. 483, is pertinent. He said:

"The fourth article [of the treaty] draws the boundary between the Indians and the citizens of the United States. But, in describing this boundary, the term 'allotted' and the term 'hunting-ground' are used.

＊   ＊   ＊   ＊   ＊   ＊

"So with respect to the words 'hunting-grounds'. Hunting was at that time the principal occupation of the Indians, and their land was more used for that purpose than for any other. It could not, however, be supposed that any intention existed of restricting the full use of the lands they reserved.

"To the United States, it could be a matter of no concern, whether their whole territory was devoted to hunting-grounds, or whether an occasional village, and an occasional cornfield, interrupted, and gave some variety to the scene."

The idea of a mere road or passageway ten miles wide is ridiculous on its face. The Government does not even attempt to maintain that impossible position. It does not deny that the Delawares had all the rights in this land which Indians ever had or wanted in uninhabited land. It recognized their right to the exclusive possession of the land and hastened to secure that possession to them when it was challenged. There is no reason to give the words of grant a meaning other than their normal meaning.

The Indian Claims Commission at page 576 of its opinion mentioned the various maps made after the grant to the Delawares. Most of the maps show no separation at all between the residence lands and the outlet, and designate all the land simply as Delaware land. The Commission says "we draw no important inference from the lack of such a line". Then the Commission says:

"On the other hand, the Isaac McCoy map (46–A (1)) and his field notes (Def.Ex. 46–B (1)) locate and graphically show the east boundary of the outlet in accordance with the calls of the treaty description. This map seems to have been the basis for many of the other maps. We think the McCoy map is of importance as indicating a line separating the two divisions of the Delaware lands—a logical separation, in accordance with the treaty division."

The Commission's deduction from these two exhibits is erroneous. The grant in the treaty called for a line leaving the Missouri River at Fort Leavenworth, and drawn "westwardly" leaving a space ten miles wide north of the Kansas boundary line. The only possible way of ascertaining the course of that "westwardly" line was to first locate a point ten miles straight north of the northeast corner of the Kansas lands, and then run a straight line from Fort Leavenworth to that point. On McCoy's map, the line north from the northeast corner of the Kansas lands is almost invisible, it in no manner resembles the boundary lines which he shows around

the treaty lands, and was obviously inserted merely to show how he located the western terminus of the north line of the residence lands. The map and notes which the Indian Claims Commission regarded as important have not the slightest significance as support for the Commission's conclusion.

The resolution of the Senate ratifying the 1829 treaty was dated May 29, 1830. The purpose of the resolution was to insure that the lands granted were carefully surveyed and marked, in the presence of an agent of the Delawares. The resolution said that the survey should

> "establish certain and notorious landmarks, accurately and permanently to distinguish the boundaries of the said granted country, and of the said outlet reserved in this treaty; * * * "

It used the same expression about the said granted country and the said outlet at two other places in the reoslution. However the Senate may have happened to hit upon this language, the surveyor, Mr. McCoy, when he made the survey called for in the resolution, placed no monuments whatever along the line between the residence lands and the outlet, although he placed such monuments every half mile along the borders of the whole area. That the language of the Senate Resolution was not thoughtfully chosen is evident from the designation of the outlet as "reserved in this treaty". Whatever may have been the nature of the title to it, it was not reserved but was granted by the treaty. There is no evidence that anyone in the Government attached to the language of the resolution the significance which the Government now, one hundred and twenty-five years later, purports to find in it. And even if it had had significance to people in the Government, how could it affect the rights of the other party to the contract, the Delawares?

If it were necessary to do so, which we think it is not, respect should be ac-corded to the statement of the Supreme Court in Jones v. Meehan, 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49, that a treaty with an Indian tribe should be construed

> "not according to the technical meaning of its words to learned lawyers, but in the sense in which [it] would naturally be understood by the Indians."

See also Choctaw Nation of Indians v. United States, 318 U.S. 423, 432, 63 S. Ct. 672, 87 L.Ed. 877.

In 1904 a petition was filed in this court on behalf of the Delaware Indians. In that proceeding it was sought to recover the difference in value between the lands in Indiana ceded by the Delawares to the United States in the Treaty of 1818, and the Kansas lands they received under the Treaty of 1829. In comparing the acreage and value of the Indiana lands with the acreage and value of the Kansas lands, the petition said, with reference to the outlet with which our instant case is concerned, that it contained about 1,000,000 acres but that the Delawares were not the owners thereof but merely had an easement or right of way therein, and that subsequently the rights of the Delawares in the outlet were purchased from them by the United States for $10,000, by the Treaty of 1854, and that the value of their rights in 1829 did not exceed $5,000.

This document, which was written some 75 years after the treaty which we have to interpret, has the distinction of being the first document which suggests that the outlet was a mere easement or right of way. It does not come within decades of being a contemporaneous construction of the treaty. The historical fact was that the United States had, by the Treaty of 1854, acquired the Delawares' interest in 1,000,000 [1] acres of land for $10,000, or one cent an acre. By that time, there was a strong demand for the land for white settlers. Unless the land was seriously defective, which it was not, the Delawares' title to it must

---

1. This figure is taken from the 1904 petition referred to above. We of course express no opinion as to the actual acreage of the outlet.

have been seriously defective, to justify the transaction. The sale itself and its terms could not be attacked, under the then existing law, since the sale was made by a treaty. It could hardly have been expected that the pleader would have contended that the interest in the outlet, obtained in the Treaty of 1829, was of great value, and was fair compensation for much land in Indiana which the Indians had given for it, but that the Indians had foolishly transferred it to the United States for a song, and had only themselves to blame for their plight. The pleader therefore discounted the nature of the Indians' title to the land. In view of the seriousness with which the idea has been taken in this case a half century later, the pleader deserves credit for originality and invention. But the idea never deserved the consideration which it has received.

### The Question of Representation

The appellants in Docket 2–54, who call themselves the Delaware Tribe of Indians, assert themselves to be the sole owners of the instant claim against the United States. The appellants in Docket 3–54, who call themselves the Absentee Tribe of Oklahoma, Delaware Nation, ex rel. W. E. Exendine and Myrtle Holder, assert that they are entitled to a share in the claim with the appellants in Docket 2–54. The Indian Claims Commission held a hearing on this question and issued a decision which appears in 2 Ind.Cl.Com. pp. 253–271. The Commission decided that both petitioners had rights in the claim and were entitled to prosecute the suit. The Government and the appellant in Docket 2–54 contend that this decision was erroneous, and ask us to reverse it.

In 1793 Baron Carondelet, the Spanish Governor at St. Louis, granted certain bands of Delaware Indians who wished to move from Ohio and Indiana to land west of the Mississippi, a tract of land in Missouri. During the years 1807 to 1815 pressure from white settlers, and depredations by the Osage Indians, caused a number of these Delawares to move on. Some went to Arkansas and Oklahoma and some to Texas, which was then Spanish territory. In 1820 there were some 700 Delawares in Texas.

After the Treaty of 1818 ceding the Indiana lands, the main body of the Delawares moved to Missouri, and after a few years to the Kansas lands granted them by the Treaty of 1829. Some of those who had gone to Texas remained there. One group, starting to move from Texas to Kansas in 1853 obtained permission from the Choctaw Nation in Oklahoma to stay on the Choctaw land, reserving the right to go on to Kansas at any time, and the Choctaws reserving the right to expel them at any time. Some did later go on to Kansas where they were accorded full rights.

By an agreement dated April 8, 1867 between the Delawares and the Cherokee Nation which occupied land in Indian Territory, the Delawares were given the right to become members of the Cherokee Nation, and were to be given land in that nation. The land was to be 160 acres for each individual of the Delaware Tribe enrolled upon a certain register made by the Delaware agent on February 18, 1867, and such others as might, within a month after the making of the agreement, desire to be added thereto.

The Delawares who removed to the Cherokee territory became members and citizens of the Cherokee Nation, but they and their descendents, who are the appellants in Docket 2–54, maintained group identity, receiving annual payments from their own tribal funds, having tribal chiefs and business committees continuously down to the present time.

Some of the Delawares who had gone to the country south of the Arkansas before or after the move to Kansas, and later some of the Cherokee Delawares came to live in the Anadarko, Oklahoma, area. These Delawares and their descendants maintained group identity, having chiefs and a tribal council up until and at the

present time. They are the appellants in Docket 3–54, the so-called "Absentee Delawares".

The Indian Claims Commission, in support of its decision that the Absentee Delawares had rights in the instant claim, cited a letter written in 1859 by the Acting Commissioner of Indian Affairs of the Department of the Interior, stating that these southern Delawares were a part of their tribe which mainly resided in Kansas, and that they had rights in common with that tribe, both as to land and as to annuities. The Acting Commissioner referred to the case of one Connor who, while living with the Southern Delawares, inherited the position of principal chief of the tribe and was recognized and accepted as such in Kansas.

In the Treaty of May 30, 1860, 12 Stat. 1129, 1130, it says:

"Whereas * * * many of the Delawares went down among the Southern Indians, and as there are still about two hundred of them there, * * * it is hereby agreed that eighty acres each be set apart for them, to be allotted to them as they return, and certificates to be then issued to them, in the same manner as to those now within the reservation, and in every respect to be governed by the same rules and regulations * * *."

The Indian Claims Commission refers to the decision of this court in Journeycake v. Cherokee Nation (The United States), 28 Ct.Cl. 281, affirmed 155 U.S. 196, 15 S.Ct. 55, 39 L.Ed. 120, particularly to page 310 of this court's opinion where it is recognized that there were, in 1867, members of the Delaware Tribe other than those who elected to incorporate themselves with the Cherokees. The Commission quotes similar language from the Supreme Court's opinion in the Journeycake case. It cites Delaware Indians v. Cherokee Nation, 38 Ct.Cl. 234, affirmed as modified 193 U.S. 127, 24 S. Ct. 342, 48 L.Ed. 646, as again recognizing that there were members of the Delaware Tribe other than those who went with the Cherokees.

We think that the alleged injury to the tribe occurred in 1854, when by the treaty of that year the Delawares' interest in so large an area of land was acquired for so little money. We think that the rule and policy of the Delawares at that time was and had been to recognize all Delawares everywhere, who had maintained their identity as Delawares, as members of the tribe. If, therefore, the alleged wrong had been actionable at the time it occurred, the absent members of the tribe would have been entitled to share in the recovery. We are cited to no rule adopted by the tribe after that time, to the effect that a Delaware who did not join the main body of the tribe and incorporate himself into the Cherokee Nation thereby forfeited or abandoned his membership in the Delawares and his rights in the tribe's property or claims.

We affirm the decision of the Indian Claims Commission as to the rights of each of the two appellants in the cause of action. We reverse its decision as to the nature of the interest of the Delawares in the outlet. We remand both cases to the Commission for further proceedings not inconsistent with our opinion.

It is so ordered.

JONES, C. J., and LARAMORE, WHITAKER and LITTLETON, JJ., concur.