UNITED STATES of America, Plaintiff,

v.

STATE OF ALASKA, City of Juneau, Alaska, and Walter D. Field, Defendants.

No. J–5–61.

United States District Court
D. Alaska.

Feb. 6, 1962.

Warren C. Colver, U. S. Atty., Anchorage, Alaska, Joseph H. Shortell, Jr., Asst. U. S. Atty., Fairbanks, Alaska, for plaintiff.

Avrum M. Gross, Asst. Atty. Gen., State of Alaska, for State of Alaska.

F. O. Eastaugh, of Robertson, Monagle, Eastaugh & Annis, Juneau, Alaska, for City of Juneau.

HODGE, Chief Judge.

Plaintiff brings this action to quiet title to certain tidelands situate within the City of Juneau adjacent to the Juneau Indian Village, claiming to be the owner in fee simple to said tidelands and that the claims of the defendants as to any estate or interest in and to the tidelands adverse to the plaintiff are without right; and also praying for injunctive relief enjoining the defendants from asserting any claim whatever in and to the tidelands or any part thereof. A preliminary injunction was entered by stipulation restraining the City of Juneau and Walter D. Field from doing further filling operations or construction work on the tidelands pending the outcome of this suit.

The description of the land claimed by plaintiff is as follows:

"An area of tidelands adjacent to the Juneau Indian Village and located Southeasterly of Willoughby Avenue and extending to deep ocean water and bounded by the Salvation Army building on the Southwest and the street from Willoughby Avenue to the Subport Area on the Northeast; a portion of said tidelands is now described as Lots 2 and 7 of Block 66 of the proposed Tidelands Subdivision of the City of Juneau; Lots 2 and 7 contain 29,-733 sq. ft. and are located adjacent to and Southeasterly of Willoughby Avenue."

The plaintiff claims the land as held in trust for the benefit of the Tlingit Indians under the Act of May 17, 1884, and that such tidelands were excepted from the grant to the Territory of Alaska and subsequently to the State of Alaska by the Tidelands Act of September 7, 1957, and the Alaska Statehood Act of July 7, 1958. The State of Alaska claims title by virtue of the grant of tidelands to it by the Tidelands Act, the City of Juneau by conveyance from the State (not yet executed but held pending this suit) pursuant to Section 5 of Article III of the Alaska Land Act (Chapter 169, Laws of Alaska 1959); the defendants contend that the use or occupancy of the tidelands by the Tlingit Indians is not such as would create a possessory right within the purview of the Act of 1884 or the exceptions in the Tidelands Act and the Alaska Statehood Act. The defendant Field is a lessee from the City and at the time of the commencement of the action had constructed a rock fill on a portion of the tidelands in question for the purpose of erecting permanent improvements thereon consisting of a 36-unit apartment hotel with 20 more units to be added later. The principal dispute is with reference to the use and occupancy by the Indians of the tidelands in question.

The pertinent provisions of the statutes mentioned are as follows:

Section 8 of the Act of May 17, 1884 (23 Stat. 26) provides:

"That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for further legislation by Congress * * *."

Section 455 of the Tidelands Act (71 Stat. 623, 48 U.S.C.A. § 455) grants to the Territory of Alaska all tidelands, excepting from the grant (Section 455b):

"(c) any land which, on September 7, 1957, is held, or any land in which, on September 7, 1957, any interest is held, by the United States for the benefit of any tribe, band, or group of Indians, Aleuts, and Eskimos or for individual Indians, Aleuts, and Eskimos."

Section 4 of the Alaska Statehood Act (72 Stat. 339, 48 U.S.C.A.) as amended by the Alaska Omnibus Act (73 Stat. 141) providing for the admission of the State of Alaska into the Union, provides that the State and its people forever disclaim all right and title to:

" * * * any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called natives) or is held by the United States in trust for said natives; that all such lands or other property (including fishing rights), the right or title to which may be held by said natives or is held by the United States in trust for said natives, shall be and remain under the absolute jurisdiction and control of the United States until disposed of under its authority, * * *."

Motions to dismiss and for summary judgment had previously been denied by this Court by opinion rendered October 10, 1961, 197 F.Supp. 834, in which the Court held that no new rights or titles were created by the 1957 and 1958 Acts, but that such Acts simply preserved all rights or interests of the United States in such lands which were "held" by the United States for the benefit of the Indians or in trust for them under the Act of 1884. In this opinion it was held that we are not here concerned with the matter of "aboriginal title" discussed by the Supreme Court in cases cited in such opinion, but with the right of occupancy as clearly defined by the Circuit Court of Appeals of the Ninth Circuit in Miller v. United States, 159 F.2d 997, 11 Alaska 285 and by the former District Court for the District of Alaska in United States v. 10.95 Acres of Land in Juneau, 75 F.Supp. 841, 11 Alaska 518. These cases involved a claimed right of compensation to the Indians for a tract of tidelands adjacent to the tract here in question known as the "Subport Area"; the tract here involved was described by the District Judge in his opinion as a "contiguous area" to the tidelands there condemned.

The uncontroverted facts may be summarized as follows:

Prior to May 17, 1884, there was a small Indian village on the shore of Gastineau Channel adjacent to the Town of Juneau and since incorporated within the town limits, which village consisted of some 20 houses erected along and on the hillside above the beach. The village was not included within the original plat of the Townsite of Juneau adopted November, 1892, but is indicated as adjacent thereto, designated "Auk Indian Village." The village, consisting of two adjacent tracts, was included in the plat of U. S. Survey #574, a Soldier's Homestead claim, approved May 17, 1905, as "Indian land."

There were no encroachments on the tideland claimed by the plaintiff until the City found it necessary in 1914 to extend Willoughby Avenue in front of the village, which was first done by constructing a pile trestle over the tideland area within approximately 100 yards of the village, which was replaced in 1934 by a rock fill providing access from the village to the tidelands beyond through culverts placed underneath, which were later filled up. At about this time the Government, at the request, or at least with the consent of the residents of the village, filled in the tideland area lying between the village on the north and Willoughby Avenue on the south.

In 1942 the Government, acting under its war powers, went into the possession

of and filled in the area described in the case of United States v. 10.95 Acres of Land, supra, referred to as the "Subport Area" and constructed thereon what is known as the Juneau Subport of Embarkation. In 1943 the Government, again acting under its war powers, went into possession of and filled a further portion of the tidelands lying between Willoughby Avenue and the Subport Area in connection with the construction of a Federal Housing project known as the "Channel Apartments." The net result is that the tideland area lying seaward from the former beach or shore of the village has all been filled in and occupied by permanent structures except the area involved in this suit, comprising approximately 5 acres.

In 1961 the Alaska Division of Lands prepared, under the provisions of the Alaska Land Act, a plat designated as "Alaska Tidelands Survey No. 3" in which plat the tideland area lying between the original beach (approximately the present "Village Street") and Willoughby Avenue was expressly excepted from the plat as "Indian Reserve." Thereafter the Town of Juneau prepared preliminary plats of the proposed "Tidelands Addition to Juneau Townsite" in which this area is likewise expressly excepted as Indian lands. The evidence disclosed that these exceptions were with the concurrence of residents of the village and representatives of the Bureau of Indian Affairs, but that there was no express relinquishment or waiver of the tidelands here involved. Effort is being made to obtain title to these tracts to the Indians.

■ It is well settled in Alaska that the Indian right of occupancy preserved by the Act of 1884 applies to tidelands as well as other lands. Heckman v. Sutter, (C.A. 9), 119 F. 83; Miller v. United States, supra; United States v. 10.95 Acres of Land in Juneau, supra. It is the nature and extent of the use or occupancy which may create and continue such possessory rights with which we are here concerned. In Heckman v. Sutter a small strip of tideland cleared

of stones and stumps to fit it for use in drawing seines and catching salmon was held to be protected in undisturbed use by the Indians as against others who assert a common right to fish therein. In Miller v. United States the Circuit Court held that while Indian claimants could not recover compensation for tidelands claimed by the United States as having been occupied by themselves and their predecessors since 1867 under their theory of aboriginal title, the allegations of their answer asserting such claims were broad enough to include a claim of possessory rights under the Act of May 17, 1884. Upon remand and trial of this issue the District Court, in United States v. 10.95 Acres of Land in Juneau, held that the evidence was insufficient to sustain the claim of the Indians to possessory rights which would be compensable upon condemnation by the United States. The test laid down by Judge Folta as to the use or occupancy which may constitute such possessory rights is as follows:

"But the use or occupancy which gives rise to such a right must be notorious, exclusive and continuous, and of such a nature as to leave visible evidence thereof so as to put strangers upon notice that the land is in the use or occupancy of another, and the extent thereof must be reasonably apparent." (Citing Cramer v. United States, 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622, and numerous other cases).

■ This decision was followed in United States v. Libby, McNeil & Libby, D.C., 107 F.Supp. 697, 14 Alaska 37, holding that a showing of actual use or occupancy is prerequisite to the existence of possessory rights, citing Russian-American Packing Company v. United States, 199 U.S. 570, 26 S.Ct. 157, 50 L.Ed. 314, and other cases. It had also been held as early as 1896 by the District Court for Alaska in Carroll v. Price, 81 F. 137, that possessory rights to tidelands will be determined by the rules of law governing similar rights to uplands until further legislation by Congress. From a careful examination of these

cases I find that the possessory rights thus asserted must not only be notorious, exclusive and continuous, but must also be substantial.

Plaintiff relies upon a decision of the Supreme Court in Alaska Pacific Fisheries v. United States, (1918) 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138. This case holds that Congress has the power in safeguarding and advancing a dependent Indian people to reserve for their use until otherwise provided by law, not only the upland but also the submerged land and deep waters supplying fisheries essential to the Indians' welfare, within an Indian reservation. This decision is not applicable here as we are concerned neither with submerged lands nor with any Indian reservation; and the power of Congress to preserve Indian rights under the Act of 1884 is not seriously questioned. Plaintiff also cites United States v. Romaine, 9 Cir., 255 F. 253; Moore v. United States, 9 Cir., 157 F.2d 760; and Delaware Tribe of Indians v. United States, 128 F.Supp. 391, 130 Ct.Cl. 782, all relating to the power of the Government to include tidelands in Indian reservations by statute or treaty, which decisions are not applicable here.

No other decisions are cited by the parties or found, upon this particular issue. Miller v. United States and United States v. 10.95 Acres of Land in Juneau are therefore controlling as the law governing this case, upon the principle of stare decisis.

■ The evidence as to the continuous actual use and occupancy by the Indians of the tidelands was somewhat conflicting, but from the testimony of some 50 witnesses and numerous exhibits, including photographs, I find as follows:

There were several villages of the Auke and Taku Indians in the vicinity of what is now Juneau at the time of discovery of gold in 1880, including Auke villages at the mouth of Gold Creek (the Juneau village) and at Auke Bay, and a Taku village south of town. The Indians hunted and fished from these villages, traveling to fishing and hunting grounds, and also traded with the Indians up the Taku River. The beach immediately in front of the Juneau village was used to store native dugout canoes, and the tidelands beyond were used for navigation in and out, for digging clams, and as a source of driftwood for fuel. Every family owned at least one canoe. After the discovery of gold the Indians moved into the Juneau village to work in the mines or cut wood for miners, but also continued to hunt and fish. The other villages were gradually absorbed into the Juneau village.

There is no question but that in these early days the use of the beach and tidelands was essential to the livelihood of the Indians. However, this use has gradually diminished until at the present time, and prior to 1957, such use or occupancy is practically negligible. After 1914 the canoes gave way to sailboats, and after the Second World War the sailboats to gas boats and skiffs, after the pattern of the white man. The beach upon which possessory rights are claimed no longer exists. There are no longer any salmon in Gold Creek nor clams on the tidelands. Some driftwood is still available but most of their wood supply is obtained from slabwood or waste from the lumber mills. Only half of the natives in the village burn wood for fuel. The present use claimed by a number of native witnesses was limited to 4 boat owners. At the time the Field lease was executed and the fill commenced a survey made by a competent marine surveyor disclosed only 5 boats in the area to be filled, all of which were derelicts or of little value. A further survey made in November, 1961, showed 8 gas boats on the tidelands, of which 3 were derelicts, and at least 2 others were brought in only recently. There were also 8 skiffs, of which 5 were derelicts. The beach around the shores of the tidelands is in fact strewn with derelict or abandoned boats, and the tide flats, which go entirely dry at low tide, are strewn with debris and the wreckage of boats. The

area was described by some witnesses as a "boneyard" or a "derelict and junk yard" for old boats. There is no boat harbor as such. The Indians claimed that the tidelands are still used, for geting wood and for the repair and storage of boats, but conceded that such use has gradually diminished, claiming that things were "easier" for them prior to the construction of Willoughby Avenue and are made harder by the fill. This use, however, is limited to a very few. There was testimony that only one Indian, who is the head man of the village, living in the ancestral tribal house, still keeps on living according to the previous ways of the natives. The Indians also claimed that they have been "crowded out." It is true that the tidelands upon which the village faced in 1884 have been considerably reduced in area, but it is also true that such reduction has been due to encroachments by the United States. The use shown does not meet the test of continuity.

Nor is such use any longer necessary. There is available to the Indians of the village for storage of their boats a small boat harbor maintained by the City which facilities are available to whites and natives alike, which are in fact used by some 30 native boats. The evidence disclosed that these facilities were used by some of the Indians, including residents of the village, for bringing in their game, seal and fish. One boat owner resident of the village who keeps his boat in the boat harbor during the summer but now has his boat in a cradle on the tidelands claimed, typically, that it was "easier" to use the tidelands. Of approximately 1600 Indians living in the City of Juneau only about 100, or 1/16, reside in the village. The boat owners are engaged in the summer months in commercial fishing along with whites, and some own very valuable boats.

All of this changed condition is due to what one witness, an expert on Tlingit culture, described as a "terrific social and economic transition." No longer are the Indians dependent upon the beach or the tidelands for their livelihood. No longer are they a dependent people. Racial discrimination is virtually nonexistent. Indians and whites are found side by side in every walk of life, including the legislative halls of the State.

Nor is such use or occupancy exclusive. Testimony of 16 witnesses disclosed that the tidelands had been used by white men for over 20 years, for the storage and repair of boats and skiffs, for copper painting of ferry boats upon a gridiron situate on the tidelands, and for storage of light poles and piling. One tract had been filled in and sold by a native resident of the village which is now occupied as a trailer site and for a real estate and brokerage office. The Salvation Army constructed a building on another site within the area upon permit issued without protest from the village.

There also appears no valid reason to apply a standard of use to the Indians in the village different from the standard applied to others.[1] The evidence shows that the City has embarked upon an overall program of community development and that such development will be seriously impeded if these tidelands cannot be used. This development is for the good of all of the citizens of Juneau, including the Indian residents, who have now all other advantages of citizenship.

In conclusion I find that the evidence is insufficient to establish a claim of possessory rights entitled to protection under the Act of 1884. Judgment may be entered dissolving the preliminary injunction and dismissing this action with prejudice. Defendants will be allowed their costs but no attorneys' fees may be taxed against the Government. No further Findings of Fact will be necessary.

---

1. The Alaska Land Act requires as a condition for allowance of preference rights for the acquisition of tidelands that such be actually occupied or developed by permanent improvements thereon, and excludes any use by placing floats or vessels upon the tideland.